## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

**CHRISTINA JACOBS,**

      **Plaintiff,**

**v.**                          **Civil Action No. 3:13cv89**
                                            **(Judge Groh)**

**ALICIA WILSON, Physician's Assistant, and**
**JANET SHACKLEFORD, Medical Doctor,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On August 1, 2013, the *pro se* plaintiff, a federal inmate incarcerated at FCI Waseca, in Waseca, Minnesota, initiated this case by filing a Bivens[1] civil rights complaint in which she alleges an Eighth Amendment violation with respect to medical care she received while incarcerated at USP Hazelton, in Bruceton Mills, West Virginia. On August 12, 2013, the plaintiff was granted permission to proceed *in forma pauperis*. The plaintiff paid her initial partial filing fee on September 12, 2013. By Order entered October 15, 2013, the plaintiff was directed to file proof of exhaustion of her administrative remedies. On November 13, 2013; the plaintiff complied with that Order.

On November 18, 2013, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Summonses were issued that same day. On February 7, 2014, the defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. A Roseboro Notice was issued on March 4, 2014. On March 10, 2014, the plaintiff filed a response, titled Plaintiff's Traverse to Defendants [sic]

---

[1] Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

Memorandum to Dismiss, or in the Alternative, for Summary Judgment. Accordingly, this case is before the undersigned for a report and recommendation on the defendants' dispositive motion.

## II. The Pleadings

## A. The Complaint[2]

The plaintiff's complaint alleges that on or about March 31, 2010, she shut her left middle finger in her cell door at SFF Hazelton. She further alleges that the injury resulted in two visible lacerations on either side of the finger.[3] According to the complaint, the plaintiff was initially seen by Jamie Hamilton, RN, who referred her to the on-duty medical doctor, Janet Shackelford ("Shackelford"). An x-ray was performed, revealing a left distal phalangeal fracture. Apparently, Dr. Shackelford concluded that the injury did not require sutures. Instead, she rinsed the wound; applied Betadine and Bacitracin; wrapped the finger with sterile gauze; and ordered an antibiotic and Motrin for pain. Although a splint was not applied that day, one was ordered for the following day's dressing change. On April 1, 2010, the plaintiff returned to the medical unit where she was seen by PA Alicia Wilson ("Wilson"). Plaintiff contends that Wilson determined that the skin around the wound was "dying," and it was medically necessary to suture the wound "to keep the Plaintiff from losing her entire fingertip." PA Wilson utilized five sutures to close the wounds. A hard plastic protective covering was placed over the finger, but there was still no splint available. The sutures were to be removed in 7 days. Although the sutures were scheduled for removal on April 8, 2010, they were not removed until April 13, 2010. The plaintiff alleges

---

[2] This is the third time the plaintiff has filed suit in this court over this same injury. See 5:12cv137 (Bivens action dismissed without prejudice on July 18, 2013 for failure to exhaust) and 1:13cv164 (FTCA action still pending).

[3] The plaintiff avers that she is left-handed. Dkt.# 1 at 9.

that by then, the skin had begun to grow around the sutures, and they had to be removed forcibly which caused her further pain and suffering.

On or about July 14, 2010,[4] the plaintiff was transferred to FPC Marianna, in Marianna, Florida.

The plaintiff maintains that on or about January 10, 2011, she met with Mid-Level Practitioner ("MLP") Abad at FCP Marianna, who ordered an x-ray of her finger. The plaintiff contends that the x-ray was read as abnormal, with distal tuft fracture with 2mm displaced fragment. On January 21, 2011,[5] the plaintiff had a follow-up appointment with MLP Abad, who discussed with her the fact that because the wound was old, Abad did not think they would do anything with it at FPC Marianna, but that Abad would schedule her for an appointment with Dr. Toledo, who could refer plaintiff to an orthopedic specialist.

The plaintiff indicates that she saw Dr. Toledo on May 26, 2011, and that they discussed the condition of her finger and her options. The plaintiff alleges that Dr. Toledo explained that in its current state, her finger would require surgical repair, and the surgery would cause her more pain than she was currently experiencing.

The plaintiff alleges that the defendants were deliberately indifferent to her serious medical needs when

1) defendant Wilson failed to provide a splint or other immobilizing device and an orthopedic referral; and

2) defendant Shackelford failed to provide sutures; an immobilizing device for the finger; effective pain medication; and an orthopedic referral.

---

[4] A review of the record reveals that the date of the transfer was actually July 6, 2010.  See Dkt.# 33-4 at 6.

[5] A review of the records available to the undersigned indicates that this visit occurred on January 13, 2014.  See 1:12cv131, Dkt.# 32-3 at 45 – 46.

The plaintiff contends that as "a direct and proximate result of the combined Constitutional violations of the named defendants . . . [she] suffers with an improperly healed finger; displaced bone fragments; limited range of motion of her middle (L) finger; disformity [sic] of her finger; and therefore, has become disfigured and disabled; [suffered] mental and emotional pain and suffering, anxiety, loss of enjoyment of life; [and will incur] future medical expenses; loss of future earning capabilities; and post-traumatic arthritis."

As relief, she seeks injunctive relief in the form of a declaration that her rights have been violated, and an Order directing the defendants to pay her $3,894,000.00 in compensatory damages; nominal damages of $75,000.00; and "punative [sic]" damages of $75,000.00; in addition to "reasonable attorney fees, medical expert fees, and costs."

**B**. **Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment**

In support of their dispositive motions, the defendants allege that:

1) the plaintiff has failed to state a claim upon which relief can be granted; and

2) the defendants are entitled to qualified immunity.

**C.** **Plaintiff's Traverse to Defendants' Motion to Dismiss or in the Alternative, for Summary Judgment**

In response, the plaintiff reiterates her arguments and attempts to refute the defendants' on the same. For the first time, she contends that the defendants had subjective awareness of the risk to her health and disregarded it. In support of her claims of deliberate indifference, she attaches an affidavit from a South Carolina chiropractor, attempting to opine as to the alleged standard of care and the defendants' deviations therefrom; excerpts from her own medical records, and several emails from what appears to be a relative, containing what appears to be copies of internet research on treatment for finger injuries and fractures.

**III.  Standard of Review**

## A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); <u>see</u> <u>also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," (<u>Id</u>). (citations omitted), to one that is "plausible on its face," (<u>Id</u>). at 570, rather than merely "conceivable." (<u>Id</u>). Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co</u>., 324 F.3d 761, 765

(4th Cir. 2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. (<u>Id</u>).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## B.  <u>Motion for Summary Judgment</u>

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).   The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine

issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u>  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u> at  256.  The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment.  <u>Id.</u> at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  <u>Matsushita</u>, at 587 (citation omitted).

## IV. <u>Analysis</u>

### A.  <u>Deliberate Indifference to Serious Medical Needs</u>

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind."  <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention.  <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 956 (1991).  A medical condition is also serious if a delay in treatment causes a

life-long handicap or permanent loss.  <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834

F.2d 326, 347 (3rd Cir. 1987), <u>cert. denied</u>, 486 U.S. 1006 (1988).[6]

The subjective component of a cruel and unusual punishment claim is satisfied by

showing that the prison official acted with deliberate indifference.  <u>Wilson</u>, 501 U.S. at 303.  A

finding of deliberate indifference requires more than a showing of negligence.  <u>Farmer v.</u>

<u>Brennan</u>, 511 U.S. 825, 835 (1994).  A prison official "must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference."  <u>Id</u>. at 837.  A prison official is not liable if he "knew the underlying facts but

---

[6] The following are examples of what does or does not constitute a serious injury.  A rotator cuff injury is not a serious medical condition.  <u>Webb v. Prison Health Services,</u> 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. <u>Veloz v. New York</u>, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999).  Conversely, a broken jaw is a serious medical condition.  <u>Brice v. Virginia Beach Correctional Center</u>, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition.  <u>Browning v. Snead</u>, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities.  <u>Finley v. Trent</u>, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. <u>Johnson v. Quinones</u>, 145 F.3d 164 (4th Cir. 1998).  A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. <u>Clinkscales v. Pamlico Correctional Facility Med. Dep't.</u>, 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. <u>Harrison v. Barkley</u>, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the <u>Estelle</u> standard.  <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 - 703 (2nd Cir. 1998).   A degenerative hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" is a serious condition. <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. <u>Loe v. Armistead</u>, 582 F.2d 1291, 1296 (4th Cir.  1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. <u>Giambalvo v. Sommer</u>, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012).  Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. <u>See</u>, e.g., <u>Lepper v. Nguyen</u>, 368 F. App'x. 35, 39 (11th Cir. 2010); <u>Andrews v. Hanks</u>, 50 Fed. Appx. 766, 769 (7th Cir. 2002); <u>Bryan v. Endell</u>, 141 F.3d 1290, 1291 (8th Cir. 1998) <u>Beaman v. Unger</u>, 838 F.Supp. 2d 108, 110 (W.D. N.Y. 2011); <u>Thompson v. Shutt</u>, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); <u>Mantigal v. Cate</u>, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) <i>report and recommendation adopted,</i> 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); <u>Johnson v. Adams</u>, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); <u>Bragg v. Tyler</u>, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); <u>Vining v. Department of Correction</u>, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. <u>Cokely v. Townley</u>, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, attached to their dispositive motion, defendants each provide sworn declarations; a copy of plaintiff's BOP Public Information Inmate Data; a copy of plaintiff's BOP Inmate History; and copies of the plaintiff's BOP medical records from March 31 – April 13, 2010, showing that the plaintiff was seen at USP Hazelton's Health Services for her finger injury four times between those dates. A review of those medical records reveals that the plaintiff was initially seen in Hazelton's Health Services by Jamie Hamilton, RN at 12:10 p.m. on March 31, 2010. Visual examination of the wound revealed "mild bleeding to the tip of the R [sic] middle digit. A laceration is present running under the nail bed and around to the pad of the finger. I/M

referred to MD for evaluation of need for sutures."[7]  Plaintiff was then seen at 12:56 p.m. by

defendant MD Shackelford ("Shackelford"), who commented

> [w]ound edges fairly well approx[imated] as bone broken and risk of infection
> will not place sutures (foreign body) and will start Bactrim antibiotics
> prophylactically. Inmate will follow up tomorrow and until wound starts to heal.
> Warning sx of infection given to inmate to immed come or have co call to HS.[8]

Dr. Shackelford then elaborated on her findings:

> [i]nmate smashed her hand in a door. Cut skin and small amount bleeding very
> painful. Xrray [sic] shows distal phalange fractured.  Cut dorsal part of finger to
> below nail and small lacation [sic] palm surface of distal 1st finger.  Cut was clean
> and min bleeding. Due to proximity of fractured bone will not place stitch to
> avoid foreign body and decrease chance of infection.  Wound rinsed for 5 minutes
> cleaned with betadine then bacitracin ointment and wrapped with sterile guaze
> [sic] the 4x4s [sic].  No splint avail will obtain for tomorrow's dressing change.
> Start bactrim DS BID and Motrin.  2008 had tetanus shot.
> . . .
> Follow up to HS daily for check and dressing change until staff stops visits.
> Return immed if fever, increased swelling, bleeding, redness [sic], drainage
> warmth occurs.[9]

The plaintiff was seen in Health Services again at 9:33 a.m. on April 1, 2010, by

defendant PA Wilson.  Wilson noted in pertinent part:

> [i]nmate seen yesterday.  She apparently shut her finger in her cell door.  Xray
> was taken yesterday with a DIP fracture (I think??).  She returned today for re-
> evaluation.  She had 2 lacerations on either side of left middle finger, out from
> nail.  They did require suturing.[10]  The lacerations were cleaned with povidine
> first, as the injury occurred yesterday.  I then injected 0.2cc %1 Lidocaine into
> each laceration.  I cleaned the wounds again.  I then placed 2 interrupted sutures
> in one laceration and 3 in the other with 6-0 nylon.  Her finger was then placed in

---

[7] Dkt.# 33-2 at 2.

[8] Dkt.# 33-2 at 3.

[9] Dkt.# 33-2 at 4 – 5.

[10] PA Wilson's sworn Declaration elaborates on this point:  "I saw the plaintiff the following day, April 1, 2010, and
determined that the wound had not improved, and should be sutured. I sutured the wound, provided the plaintiff with
pain medication, and provided a hard protective covering for the finger." Dkt.# 33-3 at 3.

a protected finger covering and wrapped.  She tolerated the procedure well, there were no complications.[11]

Wilson also prescribed Tylenol 300 mg. with Codeine 30 mg. for pain, to be given twice daily for three days; the first dose had already been given in the Clinic at 9:00 am.[12]

The plaintiff was seen again on April 5, 2010; at that visit, PA Wilson noted "[f]inger looks great. Healing well.  Requesting a few more days pain meds.  Dr. Shackelford Ok'd."[13] The plaintiff received a prescription for three more days of Tylenol with Codeine, at the same dose and schedule previously given.[14]

On April 13, 2010, the plaintiff returned to Health Services; she was seen again by PA Wilson, who noted

> [h]ere today for suture removal.  Had sutures placed 4/1 on left middle finger after she slammed finger in a door.  She says she is feeling much better. Pain is better. Pain Location: Finger(s)-Left.  Pain Scale: 5. Pain Qualities: Aching . . . Skin on finger looks great. No erythema, no discharge.  Sutures removed. . . Follow-up at Sick Call as Needed.[15]

PA Wilson's sworn Declaration notes that "[a]fter this date, the plaintiff never returned to Health Services for regarding [sic] any complaints about her finger, and on July 6, 2010 she transferred to another institution."[16]

The undersigned notes that in another _Bivens_ action plaintiff filed in this district on August 21, 2012, regarding a stress fracture in her right lower leg,[17] medical records supplied by

---

[11] Dkt.# 33-4 at 9.

[12] Dkt.# 33-4 at 9.

[13] Dkt.# 33-4 at 12.

[14] Dkt.# 33-4 at 12.

[15] Dkt.# 33-4 at 14.

[16] Dkt.# 33-3 at 3.

the defendants show that the plaintiff was seen by Health Services at USP Hazelton and FPC Marianna more than 16 times for various reasons, between June 24, 2010 – September 13, 2011. In a Health Intake Assessment performed on July 6, 2010, incident to plaintiff's transfer to FPC Marianna, when asked "do you currently suffer from any painful condition?" the plaintiff responded "Yes. Head. Also pain in teeth or mouth."[18] There was no mention of left finger pain. She was also seen in Health Services at FPC Marianna by MLP Abad for a complete physical exam on July 27, 2010; at that time, she reported her only current painful conditions were "right lower leg injury in 05-2010 doing aerobic exercises[.] Left lower leg hematoma n [sic] 07-26-2010 whlie [sic] pulling the garbage, the garbage container hit left lower leg."[19] The examiner further noted that she had no body deformities[20] and no visible problem with her fingernails on extremity exam.[21]

The plaintiff did not file a request with the BOP for an informal resolution (BP-8) related to her finger injury until December, 2010, over eight months post-injury. In that BP-8, she stated "I severely cut and broke the tip of my middle L finger at Hazelton FCI in W. Virginia" and she requested "reconstructive and rehabilitative treatment and services."[22] In a December 13, 2010

---

[17] The plaintiff has also filed four cases over the same May, 2010 stress fracture injury to her right lower leg: Jacobs v. Abad, 5:12cv363 (N.D. Fla. Feb. 25, 2014)(Bivens action dismissed for failure to state a claim); Jacobs v. United States, 5:13cv69 (N.D. W.Va. Apr. 14. 2014)(FTCA dismissed for failure to state a claim and warned of three-strike rule), *appeal docketed,* No. 14-6676 (4th Cir. May 1, 2014); Jacobs v. United States, 5:13cv278 (N.D. Fla.)(FTCA transferred to N.D. W.Va. on Jan. 10, 2014); Jacobs v. Wilson, 1:12cv131 (N.D. W.Va. Dec. 16, 2013)(Bivens action dismissed for failure to state a claim and for failure to exhaust); and Jacobs v. United States, 5:14cv4 (N.D. W.Va.)(FTCA action transferred from N.D. Fla. on Jan. 10, 2014; still pending).

[18] See 1:12cv131, Dkt.# 32-3 at 3-5.

[19] See 1:12cv131 Dkt.# 32-3 at 11.

[20] See 1:12cv131, Dkt.# 32-3 at 12 and Dkt.# 32-3 at 19.

[21] See 1:12cv131, Dkt.# 32-3 at 19.

[22] Dkt.# 18-1 at 4.

response, her counselor advised "[o]ld injury to finger – Medical provider has ordered xray to ensure proper healing."[23]

Thereafter, plaintiff's first post-initial-injury complaint related to her left middle finger injury to any BOP healthcare provider was made at a January 10, 2011 Health Services visit at FPC Marianna, when she was seen by MLP Abad. At that time, it had been almost 9 months since the April 13, 2010 suture removal. The record of that encounter indicates she presented for several complaints, one of which was pain in her finger. On exam, with respect to her "Wrist/Hand/Fingers," she was found to have full range of motion; normal active range of motion; normal passive range of motion; and the neurovascular supply to the area was intact. In addition, she had no joint deformity; malalignment; swelling; ecchymosis; erythema; or tenderness.[24] An x-ray performed on January 13, 2011 did reveal her old distal tuft fracture with 2 mm displaced fragment.[25] She was already taking Indomethacin for a right lower leg injury; no further medication was ordered.

On May 16, 2011, the plaintiff filed a BP-9,[26] requesting to talk to an orthopedic specialist to evaluate her damaged L middle finger.[27]

The record of a May 26, 2011 examination at FPC Marianna, "to be evaluated on an old injury" by a "Dr. Toledo" indicates that plaintiff's left middle finger had an old healed scar with numbness at the distal medial side; no pain from the distal tip of the finger, but "some pain when

---

[23] Dkt.# 18-1 at 4.

[24] See 1:12cv131, Dkt.# 32-3 at 39-40.

[25] See 1:12cv131, Dkt.# 32-3 at 45-46.

[26] Because the BP-8 was denied on December 13, 2010, plaintiff's BP-9 should have been filed within 20 calendar days from that date, or by January 2, 2011, at the latest.

[27] Dkt.# 18-1 at 5.

pressing the fingertip."[28] Dr. Toledo documented that he told plaintiff that there was nothing to be done for the fractured distal tuft; she was advised to "continue exercising the motion of the fingertip;" and that the plaintiff "expressed understanding everything explained."[29]

The Warden denied plaintiff's BP-9 remedy request on June 3, 2011, stating in pertinent part, that

> [y]ou were evaluated on May 26, 2011, by the Clinical Director here at FCI Marianna, due to your continued concerns regarding your finger. The Doctor reviewed your medical record regarding this injury and evaluated the current status of your finger. He advised there is no other treatment recommended for your finger. He counseled you on exercising your fingertip to help increase motion and flexibility.[30]

Although the plaintiff was seen three times thereafter in Health Services for various complaints, through September 13, 2011, when the available medical records end, there was never any further mention of finger pain; her finger injury; or any request for additional treatment for it.[31]

On October 6, 2011, the plaintiff filed her Regional Administrative Remedy Appeal (BP-10), again requesting to see and talk to an orthopedic specialist about her finger.[32] She received a denial of that remedy on December 27, 2011, which noted that

> [y]our sutures were removed on April 13, 2010, and you indicated you were feeling much better. You did not voice any further complaints of pain in your injured finger until your Hypertension Chronic Care Clinic encounter on January

---

[28] See 1:12cv131, Dkt.# 32-3 at 57.

[29] See 1:12cv131, Dkt.# 32-3 at 57.

[30] Dkt.# 18-1 at 5.

[31] See 1:12cv131, Dkt.# 32-3 at 58 – 67.

[32] Although not rejected on this basis, the BP-10 was filed almost 3 ½ months late. A denial of a BP-9 by the Warden must be filed within twenty (20) calendar days of the Warden's response or the date the response would have been due. Title 28 C.F.R. §§542.18; 542.15(a).

10, 2011, at which time your pain medication was renewed[33] . . . On May 26, 2011, the Clinical Director reviewed the results of an x-ray of your left third finger conducted on January 12, 2011 [sic]. The x-ray showed a 2mm fragment from fracture of the distal tuft. The Clinical Director examined your finger and subsequently explained that your condition does not require any further treatment . . . you received appropriate treatment in accordance with your clinical presentation. Your condition does not warrant an orthopedic consultation.

Dkt.# 18-1 at 8.[34]

### 1) Defendant Alicia Wilson, PA

Here, the facts admitted by Jacobs do not suggest that Wilson ignored her medical problem, or that Wilson provided treatment that could be remotely construed as insignificant. To the contrary, the record shows that the plaintiff received prompt, appropriate and attentive medical care from defendant Shackelford.

Plaintiff's first claim, that Wilson was deliberately indifferent for not providing her with "a splint or other immobilizing device" lacks support in the record and contradicts plaintiff's own claims in the complaint. While Dr. Shackelford's March 31, 2010 note states that no splint was available the day plaintiff was injured, it specified that one would be obtained for plaintiff's dressing-change-visit the following day. As promised, the next day, PA Wilson had available

---

[33] The medication that was renewed at that visit was Indomethacin, a non-steroidal anti-inflammatory ("NSAID") prescribed for pain from her R lower leg stress fracture. Dkt.# 32-3 at 41.

[34] The denial of the BP-10 advised that if dissatisfied with the response, she should file her appeal within 30 calendar days of the date of the December 27, 2011 response. Despite that, plaintiff did not file her BP-11 appeal to the Central Office until December 11, 2012, eleven months later; in it, she complained of receiving inadequate care, alleged deliberate indifference, and repeated her request for an orthopedic consult. Dkt.# 18-1 at 9. The response was due by April 13, 2013 but no response was ever received. Plaintiff filed her complaint on August 1, 2013. Accordingly, the plaintiff's complaint, filed three years and four months after the date of her injury, could be construed as having been filed well outside of the applicable two-year statute of limitations. The undersigned is cognizant that while a Bivens plaintiff pursues her administrative remedies, as she is obligated to do by the PLRA, the otherwise applicable statute of limitations is tolled. Young v. Thompson, No. 2:10cv66, 2011 WL 3297494 (N.D.W. Va. July 29, 2011)(citing Johnson v. Lappin, 2011 WL: 560459 (S.D.W. Va. Jan. 6, 2011)). However, here, plaintiff's complete failure to comply with any of the BOP's deadlines for timely completion of each step in the BOP's three-tier Administrative Remedy Procedure as set forth in Title 28 C.F.R. § 542.10, et seq. has rendered her claims grossly untimely. However, for whatever reason, because the BOP did not deny any of plaintiff's remedy requests on the grounds of untimeliness, the claims will be given review.

and did apply a hard plastic protective covering to plaintiff's finger after suturing and re-dressing the wound.[35] Plaintiff's insistence that no actual "splint" was ever given is a distinction without a difference; it is clear that the "hard plastic covering" was an "immobilization device" intended to stabilize the fracture and protect the fingertip from further injury until it healed. Moreover, even if no splint or "immobilization device" had ever been given, it would not change this analysis, because a splint is not a mandated requirement in the treatment of a tuft fracture.[36]

Plaintiff's claim that Wilson left her stitches in too long, because they were left in for twelve instead of seven days, requiring them to be "removed forcefully" causing plaintiff "further pain and suffering," likewise lacks support in the record. The medical record of the visit that day only indicates that the skin on the finger "looks great. No erythema, no discharge. Sutures removed."[37] Moreover, this claim has no merit, because "[d]ifferent parts of the body require suture removal at varying times. . . [and] times vary according to the health care professionals that perform the procedure." Sutures in extremities are commonly removed in ten - fourteen days.[38]

Finally, plaintiff's claim that Wilson was deliberately indifferent because she did not refer plaintiff to an orthopedic specialist likewise fails to state an Eighth Amendment claim. A disagreement between an inmate and his physician as to what medical care is appropriate does not state a claim for deliberate indifference to medical needs. See Wright v. Collins, supra at

---

[35] Dkt.# 33-4 at 9; Dkt.# 33-3 at 3.

[36] "8. The patient *may* wear a protective splint or bulky dressing over the fingertip and distal interphalangeal (DIP) joint to prevent movement. The splint also protects the finger from accidental reinjury. However, do *not* immobilize the entire finger with the dressing or splint. Complete immoblization leads to unnecessary finger stiffness. 9. Once the finger is less tender (usually within 10–14 days), encourage the patient to gradually resume normal use of the finger." See http://practicalplasticsurgery.org/docs/Practical_30.pdf (emphasis added).

[37] Dkt.# 33-4 at 14.

[38] See http://www.emedicinehealth.com/removing_stitches/page2_em.htm

849 (finding that a disagreement between an inmate and a physician over the proper medical care did not establish a claim of deliberate indifference). Moreover, as Wilson is only a physician assistant and not a medical doctor, it is unclear whether Wilson even has independent authority to refer the plaintiff to an outside specialist.

Here, the plaintiff fails to point to a single act or omission by Wilson which was sufficiently harmful to evidence deliberate indifference. Although the plaintiff insists that her medical treatment was inadequate, and, in her response to the defendants' dispositive motion, she finally alleges that PA Wilson knew of and disregarded a serious risk of injury to her, her claims have little support in the record. At best, her claims arise to nothing more than a disagreement between herself and defendant Wilson over her diagnosis or course of treatment. This is not sufficient to state a claim under the Eighth Amendment.

**2) <u>Defendant Janet Shackelford, M.D.</u>**

In the instant case, the facts admitted by Jacobs do not suggest that Shackelford ignored her medical problem, or that Shackelford provided treatment that could be remotely characterized as insignificant. To the contrary; the record shows that the plaintiff received prompt, appropriate and attentive medical care from defendant Shackelford.

Plaintiff's claim that Shackelford was deliberately indifferent for failing to suture her finger lacerations on the day of injury lacks merit. Shackelford's March 31, 2010 notes set forth a reasonable medical rationale for the decision not to suture: the wound edges were already fairly well approximated, and because the bone fragment was present and the skin broken, she wanted to avoid increasing the risk of infection by placing the "foreign body" of a suture so close to the bone fragment, but instead, after thoroughly cleaning and dressing the wound and starting

prophylactic antibiotics, Shackelford scheduled follow up wound care for the next day.[39] Shackelford's sworn declaration on the point states "[a]lthough . . . [plaintiff] had some bleeding, it was minimal; and as the wound was not clean, I chose to delay stitching her finger to observe for signs of infection . . . The wound edges were well approximated at that time."[40] Likewise, there is nothing in the medical records to support plaintiff's claim that PA Wilson determined that the skin around the wound was "dying" the next day, thus requiring sutures "to keep Plaintiff from losing her entire fingertip," let alone that PA Wilson "did not understand why Dr. Shackleford [sic] had not placed sutures on her finger the day before because it was obvious that they were needed."[41]  Setting aside for the moment the implausibility of tissue necrosis being evident so soon, the undersigned finds that this claim, in addition to being unsupported in the record, is suspect, because the treatment for necrotic skin would not be sutures, it would be wound debridement.[42] In any event, while Wilson's April 1, 2014 note does not specifically explain why the lacerations "did require suturing,"[43] her sworn declaration states that when she saw the wound that day, "the wound had not improved, and [needed to] . . . be sutured." [44] The undersigned construes this statement to indicate that local swelling in the area may have caused the wound edges to separate, finally necessitating closure with suture.

Plaintiff's next claim, that Shackelford was deliberately indifferent to her finger injury for not providing her with "an immobilizing device" for her finger likewise lacks support in the

---

[39] Dkt. # 33-2 at 3 - 6.

[40] Dkt.# 33-1 at 2.

[41] Dkt.# 1, ¶5 at 9.

[42] See http://endoflifecare.tripod.com/imbeddedlinks/id3.html

[43] Dkt.# 33-4 at 9.

[44] Dkt.# 33-3 at 3.

record. Shackelford's sworn declaration states that "[d]ue to the location of the fracture, neither surgery nor a splint was medically warranted as the fracture was only two millimeters from the tip of the finger, and her finger's mobility was unaffected."[45]  Despite the fact that a splint was not medically required, Shackelford's March 31, 2010 note states that because no splint was available the day plaintiff was injured, one would be obtained for plaintiff's dressing-change-visit the following day.  Plaintiff herself admits that "[a] splint, however, was ordered [by Shackelford] for the following days' [sic] dressing change,"[46] and that it was a "hard plastic, protective covering."[47] Likely at Shackelford's order, the following day, as noted *supra,* PA Wilson had available and applied a "hard protective covering" after suturing and re-dressing the wound. Further, also as noted *supra,* a splint is not mandated in treatment of a tuft fracture.

Plaintiff's claim that Shackelford was deliberately indifferent because she did not provide plaintiff with "effective pain controlling medications" likewise fails to state an Eighth Amendment claim.  Shackelford did prescribe Motrin for pain on the day of the injury.[48] The next day, she approved PA Wilson's prescription of Tylenol with Codeine;[49] the plaintiff was given her first dose at 9:00 a.m. in Clinic, before she was seen by PA Wilson;[50] four days later, Shackelford renewed the prescription when PA Wilson notified her that plaintiff requested it.[51]

---

[45] Dkt.# 33-1, ¶3 at 2.

[46] Dkt.# 1, ¶4 at 9.

[47] Dkt.# 1, ¶6 at 9.

[48] Dkt.# 33-2 at 4 – 6.

[49] Dkt.# 33-4 at 9.

[50] Dkt.# 33-4 at 9.

[51] Dkt.# 33-4 at 12.

Moreover, plaintiff's claim that she "suffered for months"[52] with her finger injury is belied by her own medical records, which show that at the April 13, 2010 visit, she reported to PA Wilson that she was "feeling much better. Pain is better."[53] She never returned to Hazelton's Health Services again requesting any treatment for the finger, before transferring out of Hazelton on July 6, 2010.[54] Furthermore, on July 6, 2010[55] and July 27, 2010,[56] when questioned as to whether she currently had any painful condition anywhere in her body, she never reported any pain finger pain; and she never returned to Health Services for any finger-related complaint at all until nine months after the stitches were removed;[57] coincidentally, it was one month after the BP-8 she finally filed on the issue was first denied. The only pain-related findings in her May 26, 2011 examination at FPC Marianna were some numbness of her old healed scar at the distal medial side; no pain from the distal tip of the finger, but "some pain when pressing the fingertip."[58] The records available to the undersigned do not indicate that plaintiff ever complained of left middle finger injury pain to any health provider again.

Plaintiff's claims that she now has an "improperly healed finger . . . limited range of motion of her middle (L) finger; disformity [sic] of her finger" likewise have no support in the record. To the contrary, a complete physical exam performed on July 27, 2010 showed that she

---

[52] Dkt.# 1 at 7.

[53] Dkt.# 33-4 at 14.

[54] Dkt.# 33-3 at 3; Dkt.# 33-4 at 6.

[55] See 1:12cv131 Dkt.# 32-3 at 3 – 5.

[56] See 1:12cv131 Dkt.# 32-3 at 11.

[57] See 1:12cv131, Dkt.# 32-3 at 39 – 40.

[58] See 1:12cv131, Dkt.# 32-3 at 57.

had no visible problem with her fingernails on an extremity exam;[59] and musculoskeletal exams performed on her left hand on January 10 and 13, 2011 showed that her wrist, hand, and fingers had full range of motion; normal active range of motion; normal passive range of motion, and that the neurovascular supply was intact. The examiner specifically noted that there was no joint deformity, malalignment, swelling, ecchymosis, erythema, or tenderness.[60]

Nor does plaintiff's claim that Shackelford was deliberately indifferent because she did not refer her to an orthopedic specialist state an Eighth Amendment claim. A disagreement between an inmate and his physician as to what medical care is appropriate does not state a claim for deliberate indifference to medical needs. See Wright v. Collins, *supra* at 849.

Here, the plaintiff fails to point to a single act or omission by Shackelford which was sufficiently harmful to evidence deliberate indifference. Although the plaintiff insists that her medical treatment was inadequate, and, in her response to the defendants' dispositive motion, she finally alleges that Dr. Shackelford knew of and disregarded a serious risk of injury to the plaintiff, her claims have little support in the record. Indeed, it is apparent from the available record that the plaintiff rarely sought treatment for her finger after the initial injury period; often denied pain when queried; and had no visible disability or limitation from the injury. Like her claims against PA Wilson, at best, plaintiff's claims against Shackelford arise to nothing more than a disagreement between herself and defendant Shackelford over her diagnosis or course of treatment. This is not sufficient to state a claim under the Eighth Amendment.[61]

---

[59] See 1:12cv131 Dkt.# 32-3 at 19.

[60] See 1:12cv131, Dkt.# 32-3 at 39 - 40 and 45 – 46.

[61] Because the plaintiff has not raised any claim of medical negligence against the defendants, the undersigned will not address any claim under the West Virginia Medical Professional Liability Act ("MPLA"), codified at W.Va. Code § 55-7B-1 *et seq.,* or the applicability of the affidavit plaintiff proffers from the South Carolina chiropractor, attempting to opine as to the applicable standard of care for a licensed medical doctor and/or a physician's assistant. See W.Va. Code §55-7B-7.

**B. The Prison Litigation Reform Act of 1996**

The Prison Litigation Reform Act of 1996 ("PLRA") has restricted when an inmate's complaint may be filed without prepayment of fees. Specifically, 28 U.S.C. §1915(g) provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

Here, a June 16, 2014 PACER review of the plaintiff's filings reveals that she has filed seven Bivens and/or FTCA actions since August 21, 2012,[62] two of which have already been dismissed for failure to state a claim upon which relief can be granted.[63] Further, as noted *supra*, the plaintiff still has a FTCA action pending in this district over this same finger injury.[64]

Accordingly, the plaintiff is again warned that pursuant to 28 U.S.C. §1915(g), she will not be granted *in forma pauperis* status in the future, if she has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."

## V. Recommendation

---

[62] Four of plaintiff's cases alleged claims regarding a May, 2010 injury to her right lower leg; the other three allege this same March 31, 2010 injury to her left middle finger.

[63] See Jacobs v. Abad, 5:12cv363 (N.D. Fla. Feb. 25, 2014)(Bivens action dismissed for failure to state a claim); and Jacobs v. United States, 5:13cv69 (N.D. W.Va. Apr. 14. 2014)(FTCA dismissed for failure to state a claim and warned of three-strike rule), *appeal docketed,* No. 14-6676 (4th Cir. May 1, 2014).

[64] See N.D. W.Va. 1:13cv164.

For the foregoing reasons, the undersigned recommends that the defendants' Motion to Dismiss or in the Alternative, For Summary Judgment (Dkt.# 32) be **GRANTED** and plaintiff's complaint (Dkt.# 1) be **DISMISSED with prejudice for failure to state a claim upon which relief can be granted**.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, or by July 3, 2014, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to her last known address as shown on the docket, and electronically to all counsel of record.

DATED: June 19, 2014

/s/    James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE